Eugene WELCH, Petitioner,

v.

Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.

Civ. A. No. 64–H–103.

United States District Court
S. D. Texas,
Houston Division.

Oct. 20, 1964.

Robert Doss, Denison, Tex., and Charles E. Hughes, Sherman, Tex., for petitioner.

Waggoner Carr, Atty. Gen. of Texas, Sam R. Wilson, Asst. Atty. Gen., Houston, Tex., for respondent.

NOEL, District Judge.

Eugene Welch, petitioner herein, a prisoner in the custody of the Texas Department of Corrections in this District and Division, seeks a writ of habeas corpus under 28 U.S.C.A. § 2241.

Upon filing his application, petitioner, under sentence of death, prayed for a stay of execution pending the determination of the questions raised by his petition. Being of the opinion that a stay of execution should be granted in order that counsel might prepare and submit adequate briefs, and in order that the Court might give full and adequate consideration to the evidentiary and legal questions presented, the Court did order that the execution be stayed under 28 U.S.C.A. § 2251 until final disposition of these proceedings.

Petitioner complains that the judgment and sentence of the Fifteenth District Court of Grayson County, Texas, by virtue of which he is imprisoned and faced with execution, are in violation of the rights to due process and equal protection of the laws guaranteed him by the Fourteenth Amendment to the United States Constitution.

Petitioner's trial on an indictment charging him with murder with malice was begun January 14, 1963. His sole defense was that he had been insane at the time he caused the death of the deceased. He also contended that he was insane at the time of trial. Both issues were hotly contested.

Dr. Wells, a psychiatrist, testified that he had examined petitioner and had conducted certain tests to aid in the determination of petitioner's mental condition.

Those tests were said by Dr. Wells to have shown petitioner to have the mental capacity of a twelve-year-old. Dr. Wells further testified that in his opinion petitioner had not known the nature of his acts or the difference between right and wrong either at the time he caused the death of the deceased or at the time of trial.

The prosecution countered Dr. Wells' testimony with the testimony of a number of witnesses, among them a doctor who had had several periods of observation of petitioner and a farmer for whom petitioner had worked during the two months preceding the killing.

On January 24, 1963, petitioner was found guilty by the jury, which resolved the issues of insanity against him. The Court of Criminal Appeals of Texas, on the appeal, found that the evidence was sufficient to sustain the jury findings that petitioner was sane at the time the offense was alleged to have been committed and at the time of trial, and affirmed the conviction. Welch v. State, Tex.Cr.App., 373 S.W.2d 497 (1963).

Following denial by the Court of Criminal Appeals of Texas of petitioner's motion for rehearing of the appeal, his counsel filed with the trial judge, on January 21, 1964, a motion pursuant to art. 932b, § 3, Vernon's Ann.Tex.Code of Crim.Proced., requesting a presentence hearing thereunder to determine whether petitioner was then sane. Attached to the motion was an affidavit of Dr. Wells asserting that petitioner was insane.

After hearing the arguments of counsel, the trial judge denied the motion for a presentence sanity hearing. Upon the following day petitioner was sentenced to death by electrocution.

Counsel for petitioner attempted to appeal the denial of the motion for a presentence sanity hearing to the Court of Criminal Appeals of Texas, but leave to file the appeal in that court was denied on February 4, 1964 "for want of jurisdiction of the attempted appeal."

On February 28, 1964, counsel for petitioner filed with the trial judge a motion

requesting a post-sentence sanity hearing under art. 932b, § 4, Tex.Code of Crim. Proced., which referred to the affidavit of Dr. Wells which had been filed with the motion under § 3. This motion was also denied.

On February 29, 1964, an application for writ of habeas corpus was filed with the state trial court. That application set forth three contentions by which petitioner asserted he was denied his constitutional rights:

(1) The denial of his motion for a presentence sanity hearing under art. 932b, § 3, Tex.Code of Crim.Proced.;

(2) The denial of his motion for a post-sentence sanity hearing under art. 932b, § 4, Tex.Code of Crim. Proced.; and

(3) The entire trial was from its inception influenced by mob hysteria, preventing petitioner from receiving equal treatment and due process of law.

The application for a writ of habeas corpus was denied by the trial judge. Thereupon, an application for a writ of habeas corpus containing the same allegations was submitted to the Court of Criminal Appeals of Texas. It was denied March 4, 1964.

The same allegations of constitutional violations asserted by petitioner in his state court petition are now made in his application to this Court for federal habeas corpus relief. Petitioner appears properly to have exhausted his state remedies on the questions presented.

Upon the filing of petitioner's application in this Court, an evidentiary hearing was ordered. It commenced on March 18, 1964 and was reconvened and concluded on March 23, 1964. At the hearing, testimony was received from witnesses for both petitioner and respondent. A full record of the proceedings in the state courts, including a statement of facts from petitioner's trial, was submitted to the Court. Following the hearing, counsel were instructed to submit briefs. The briefs have been received and the matter is now before the Court for decision.

For petitioner to prevail on either of his first two contentions, it must be a violation of constitutional rights to *sentence* or *execute* an insane man. Although the Supreme Court has not asserted in so many words, it has implied that *executing* an insane man would amount to a denial of due process.[1] This is evident from Solesbee v. Balkcom, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950), where the Court made a determination of "whether the method applied by Georgia here to determine the sanity of an already convicted defendant [sentenced to execution] offends due process." This issue would never have been reached if it were not a denial of due process to execute an insane man, for then no inquiry into the existence of insanity, much less the adequacy of the proceeding to determine that existence, need ever have been made. See also, Caritativo v. Calif., 357 U.S. 549, 78 S.Ct. 1263, 2 L.Ed.2d 1531 (1958); Phyle v. Duffy, 334 U.S. 431, 68 S.Ct. 1131, 92 L.Ed. 1494 (1948); and Nobles v. Georgia, 168 U.S. 398 (1897).

I do not agree with the respondent's apparent contention that because Mr. Justice Frankfurter in his dissent in Solesbee so eloquently stated the reasons why the Fourteenth Amendment prohibited the execution of an insane man, the majority in the case must have held that such an execution did not deny due process. Mr. Justice Frankfurter simply dissented from the majority's holding that the there attacked procedure to determine insanity before execution was con-

---

1. After sentence of death, the test of insanity is whether the prisoner because of the defects of his faculties does not have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence to convey such information to his attorneys or the Court. Frankfurter, J., footnote 3 of dissenting opinion in Solesbee v. Balkcom, 339 U.S. 9, 20, 70 S.Ct. 457, 94 L. Ed. 604 (1950).

stitutionally proper.[2]  Furthermore, the Fourth Circuit in Snider v. Cunningham, 292 F.2d 683 at 686 (1961) has stated that the execution of an insane man would amount to a denial of due process, and relied upon the previously listed Supreme Court cases as authority for the proposition.

Whether the *sentencing* of an insane man constitutes a deprivation of constitutional rights is an unsettled question. Mr. Justice Frankfurter in his dissent in Solesbee pointed out that it offends our historical heritage to sentence as well as execute an insane man.  To support his position he quoted from 1 Hale, The History of the Pleas of the Crown 34–35 (1736), as follows:

> " 'If a man in his sound memory commits a capital offense  *  *  *  [a]nd  *  *  *  if after his trial he become of *non sane memory,* he shall not receive judgment; or, if after judgment he become of *non sane memory,* his execution shall be spared; for were he of sound memory, he might allege somewhat a stay of judgment or execution.' " 339 U.S. at 18–19, 70 S.Ct. at 462.

■  It appears that the most cogent reason for not sentencing an insane man is that a defendant should understand the proceedings against him in order to assist his counsel in his plea for mercy. "On sentencing, or even on a motion to reduce sentence, particularly in a capital case, the most persuasive, if inarticulate, plea for mercy is often made by the defendant himself.  Certainly the sentencing court should make sure that this final plea for life is not jeopardized by the helpless mind of the defendant." Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867 (D.C.Cir. 1963), dissenting opinion at 879.  However, this

reason is of no vitality here, for the trial judge in Texas has no discretion in imposing sentence, but must follow the verdict of the jury.  Arts. 766–767, Tex. Code of Crim.Proced.  Furthermore, the Supreme Court has held that a failure to give a defendant an opportunity to speak in his own behalf before sentencing is not a constitutional error subject to collateral attack.  Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

For purposes of this case, however, the unconstitutionality of both sentencing and executing an insane man will be assumed without being decided, for I hold that the procedures employed in this case to determine the sanity of petitioner, before sentencing and impending execution, complied with due process.

■■  The procedures provided by the pertinent statute, art. 932b, §§ 3 and 4, Tex.Code of Crim.Proced., are adequate safeguards.  At the post-conviction stage of a capital case, it is entirely proper for a state to condition a prisoner's right to a sanity trial upon a preliminary determination by a responsible official, in this instance the trial judge himself, that a reasonable doubt exists as to sanity, and this preliminary determination may even be made *ex parte.*  Caritativo v. Calif., supra; Solesbee v. Balkcom, supra.

The true question presented here is whether the petitioner was denied due process by the determination of the trial judge on the information before him that no reasonable doubt as to sanity existed.

On January 21, 1964, counsel for petitioner filed a motion pursuant to art. 932 b, § 3, Tex.Code Crim.Proced., requesting a presentence hearing thereunder to determine whether petitioner was then sane.

2.  This is supported by the statement in the dissent that:
"The question is this: may a State without offending the Due Process Clause of the Fourteenth Amendment put to death one on whose behalf it is claimed that he became insane while awaiting execution, if all opportunity to have his case put is denied and the claim of supervening insanity is rejected on the basis of an *ex parte* inquiry by the Governor of the State?"  339 U.S. at page 14, 70 S.Ct. at 460.

Art. 932b, § 3, Tex.Code Crim.Proced. provides that:

"If the question of the sanity of the defendant is raised after his conviction and prior to the pronouncement of sentence in a felony case or while an appeal from that conviction is pending, and sufficient proof is shown to satisfy the judge of the convicting court that a reasonable doubt exists as to the sanity of the defendant, the judge shall empanel a jury to determine whether the defendant is sane or insane. If the jury finds the defendant is insane, the court shall enter an order committing the defendant to a State mental hospital and placing him in the custody of the sheriff for transportation to a State mental hospital to be confined therein as a person charged with a criminal offense until he becomes sane. If the jury finds the defendant is sane, the proceedings in the case against him shall continue."

Attached to the motion was the affidavit of Dr. David Wells, the same psychiatrist who had testified in petitioner's behalf at the trial. The relevant portion of the affidavit is as follows:

"I am acquainted with Eugene Welch, who was convicted of the crime of murder in 15th District Court, Grayson County, Texas. I have interviewed him several times, administered several tests to him, and the last time I interviewed him was today, January 21, 1964.

"In my opinion Eugene Welch is mentally ill at the present time, cannot understand the nature and consequences of the act he committed, cannot fully understand the nature of the proceedings which have been had and which are continuing against him, and cannot differentiate right from wrong in the legal sense at the present time. I believe him to be insane at the present time."

No controverting affidavits were submitted by the prosecution. A 15-day postponement of sentencing requested by petitioner to enable the gathering of additional testimony as to his present sanity was denied by the trial court. After hearing arguments of counsel, the Court denied the motion for a presentence sanity hearing. Petitioner attempted to appeal this denial, but the Court of Criminal Appeals of Texas on February 4, 1964, refused leave to file "for want of jurisdiction of the attempted appeal."

On February 28, 1964, counsel for petitioner filed with the trial court a motion requesting a post-sentence sanity hearing under art. 932b, § 4, Tex.Code Crim.Proced., which provides the following:

"If the question of the sanity of a person under death sentence is raised and sufficient proof is shown to satisfy the judge of the convicting court or the judge of the district court of the county in which the person is confined that reasonable doubt exists as to his sanity, the judge shall empanel a jury to determine whether the person is sane or insane. If the jury finds the person is insane, the court shall enter an order committing him to a State mental hospital to be confined therein as a person charged with a criminal offense until he becomes sane. If the jury finds the person is sane, the court shall remand him to the proper authority for disposition according to law."

This motion for a post-sentence sanity hearing referred to the affidavit of Dr. Wells which had been filed with the earlier motion under § 3. The motion was denied and apparently no appeal taken.

Petitioner asserts he was denied due process by the trial judge's determination that no reasonable doubt existed as to his sanity before sentencing and execution, because the judge acted without any evidentiary basis and contrary to competent psychiatric evidence. It is apparently further asserted that the denial of due process was compounded in the case of the presentence sanity determination by the nonreviewability of that determi-

nation, and by the refusal of a postponement of sentencing in a situation where petitioner had previously been removed from the place of his trial to Huntsville, making psychiatric examination almost impossible.

■ The lack of reviewability of a determination under art. 932b § 3 does not offend due process. Solesbee v. Balkcom, supra. The complaint of a failure to furnish additional time to obtain psychiatric evidence and of the impossibility of obtaining such evidence because of petitioner's removal to Huntsville are without substance. The affidavit of Dr. Wells attests that an ample amount of time was available to obtain a psychiatric opinion of insanity. Moreover, the evidence adduced at this Court's evidentiary hearing on March 23, 1964 reflects that another psychiatric examination was made by a second psychiatrist prior to the trial court's determination under § 3, but that neither notice of the examination nor the opinion of sanity resulting from it was presented to the judge before his decision. However, this psychiatrist's conclusion was conveyed by the special prosecutor to the judge prior to his action on the motion for a post-sentencing sanity hearing under § 4.

■■ The trial judge did not act capriciously or without basis in overruling petitioner's motions under art. 932b, §§ 3 and 4. The petitioner has the burden under the Texas statute of showing a reasonable doubt of sanity. The only evidence presented in support of such mo-

tions was an affidavit by the same psychiatrist who at trial had testified that the defendant was insane at the time of the offense and at the time of trial. By its verdict, the jury rejected this testimony and discredited the psychiatrist. While not binding upon the trial judge as to determinations later made by him, it is worthy of notice that the attitudes of the jury and trial judge toward this psychiatrist and his testimony were consistent.

■ In considering said motions, the trial judge had the benefit of having heard this psychiatrist's testimony and observed his demeanor at the trial. He also had the opportunity of observing the defendant during the trial and at the hearing under § 3. There was additional psychiatric evidence available which could have been, but was not, presented at the hearing. However, the general import of this latter evidence was imparted to the judge by the special prosecutor prior to his ruling on the motion under § 4. This evidence could be given some weight by the judge, for adversary proceedings with obedience to rules of evidence are not required in post-conviction sanity hearings.[3]

■ However, even disregarding any reliance on this latter evidence, I hold that the trial judge's determination under both §§ 3 and 4 of art. 932b that reasonable doubt as to sanity did not exist, was not devoid of any basis and did not deny the petitioner due process.[4] In doing so, I disregard any reliance what-

---

3. As pointed out by Mr. Justice Harlan in his concurring opinion in Caritativo v. Calif., 357 U.S. at 551, 78 S.Ct. at 1263–1264:

    "And having regard to the natural and impelling impulse of lawyers representing condemned men to stave off their execution as long as possible, I also think it constitutionally permissible for the State to conclude that such a preliminary determination should be made *ex parte*. It is a legitimate consideration for California to take into account that an adversary proceeding on the issue of probable cause might open the door to interminable delaying maneuvers in capital

cases, contrary to the sound administration of justice."

4. Even if due process had been denied by the complained-of action of the trial judge, this Court would not have held a sanity hearing as suggested by petitioner, for the only relief to be obtained by a writ of habeas corpus is discharge from illegal detention. Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960). Reliance by petitioner upon Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as support for this suggestion is misplaced. The hearing required by that case is merely

ever which. the trial judge may have placed upon the psychiatric opinion imparted to him by the special prosecutor.

■ Although not asserted in the petition for writ of habeas corpus, a new constitutional allegation raised its head at the evidentiary hearing and in the briefs[5] submitted to the Court. This is the allegation of suppression of evidence in the form of a letter written by petitioner to the local sheriff, allegedly confessing untruthfully to many crimes. Petitioner contends that this letter would have afforded the basis for additional psychiatric testimony regarding insanity. This contention was not raised in the application for writ of habeas corpus denied by the Court of Criminal Appeals of Texas on March 4, 1964, which exhausted state remedies on the other grounds asserted here. However, it was apparently raised on appeal to the Court of Criminal Appeals of Texas, which sufficiently exhausted state remedies as to it. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963).

Uncertainty exists whether petitioner is now asserting this contention as a separate constitutional ground, or is using it merely as one of the facts evidencing an atmosphere of violence and mob hysteria preventing a fair trial. Assuming it is asserted as a separate ground, it is of no merit.

On January 8, 1963, almost a week before trial, counsel for petitioner filed in the state trial court a motion to produce the letter. A hearing was held on the motion that same day. The sheriff testified that he had received several notes from the petitioner, one of which stated that the petitioner wished to discuss several other crimes he had committed. The sheriff further stated that he had investigated the matters in the note and had found them to be untrue. When asked if he still had the note, he stated he had

destroyed it, but explained that he received 15 or 20 notes a day from prisoners and that his policy was to destroy all of them.

Although the trial court did not allow petitioner's counsel to discover the exact contents of the note, the transcript of the hearing reveals that they were generally informed as to what the note said.

The activity surrounding this letter or note did not constitute suppression of evidence amounting to a denial of due process within the meaning of Ashley v. Texas, 319 F.2d 80 (5th Cir. 1963).

In the Ashley case, the prosecution knew in advance of trial, but failed to inform the defense attorney, of opinion evidence of a psychiatrist and a psychologist to the effect that the defendants there were legally insane. Consequently, this defense attorney, having received from his psychiatrist an opinion that the defendants were sane, did not raise the defense of insanity.

In our case, petitioner's counsel knew of the letter or note in advance of trial, and knew generally of its contents. At the hearing before the trial judge on January 8, 1963, petitioner's counsel stated they wanted the letter to submit to a psychiatrist to aid him in reaching his opinion as to petitioner's sanity. However, even without this letter, the psychiatrist testified that petitioner was legally insane. Thus, ours is a case where allegedly suppressed evidence was known of before trial, was not produced only because in good faith it had been destroyed, and did not deprive petitioner of a legal defense. Moreover, it was unnecessary for the very purpose for which it was sought, to provide information indicating insanity, since an opinion of insanity was formulated without it. Therefore, petitioner was not denied any constitutional rights by virtue of the destruction of this letter.

---

an inquiry into the constitutional adequacy of the state court's preliminary determination of sanity, which has already been held.

5. Petitioner's Memorandum for the Court in the Matter of the Petition of Eugene

Welch for a Writ of Habeas Corpus, p. 4; and Petitioner's Amended Memorandum Brief for the Court and Reply to Respondent's Memorandum Brief, pp. 1-2.

I now consider petitioner's last allegation. If a trial is so dominated by mob hysteria or violence that an accused is prevented from having a fair trial, a denial of due process occurs. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923). See also, Fay v. Noia, 372 U.S. 391, 421, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and Lisenba v. Calif., 314 U.S. 219, 237, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Petitioner, however, has the burden of proving that he received an unfair trial, and of proving it " * * * not as a matter of speculation but as a demonstrable reality." Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). See also, Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); Stroble v. Calif., 343 U.S. 181, 198, 72 S.Ct. 599, 96 L.Ed. 872 (1952); and United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956).

Petitioner asserts the following particulars to support his contention of mob domination:

(1) The presence of many spectators in the courtroom and adjacent public areas;

(2) The past history of violence in the area, namely the lynching in 1929 or 1930 of a negro who allegedly raped a white woman;

(3) The presence of an unnecessarily large number of armed law enforcement officers in the courtroom and courthouse;

(4) The continual printing of and reference to portions of petitioner's confession, which had been witnessed by two reporters, in both newspapers serving the area, along with continual reference to the racial facts of the case;

(5) The destruction of a letter vital to the defense from a tactical standpoint;

(6) The denial to the defense of access to the confession before trial;

(7) The unseemly haste in bringing the case to trial; and

(8) The atmosphere of the trial, which was such that the trial officials and jury were in fear for their lives if a verdict other than death were returned.

Petitioner's assertions, with the exception of No. (8), are not sufficient to prove mob dominance and community prejudice as preventing a fair trial.

The presence of many spectators augurs no ill. An incident of violence occurring in 1929 or 1930 does not demonstrate mob domination in 1963. The presence of an inordinately large number of armed police officers, which the evidence reflected to be 8 to 10, would not prevent a fair trial. The destruction of the letter, as discussed previously, was merely an act done pursuant to a normal procedure and was not done with the intent of suppressing evidence or hindering petitioner's defense. The refusal to furnish petitioner's confession to his counsel before trial does not deny constitutional rights and is no evidence of mob domination.

Petitioner's allegation of unseemly haste in bringing the case to trial is shown to be without substance when examined in the light of the records of the state trial proceedings and of the evidence obtained at this Court's evidentiary hearing.

Counsel for petitioner were appointed and the indictment under which he was convicted was returned on December 31, 1962. However, on June 18, 1962, an earlier indictment was returned against one Eugene Welch for the same offense as that for which the petitioner Eugene Welch was convicted, the killing with malice aforethought of Robert Wayne Ballou.[6] On August 11, 1962, the same counsel were appointed to represent the Eugene Welch named in that indictment as were appointed to represent the petitioner.[7] That particular indictment was dismissed December 31, 1962, the day the

6. See petitioner's exhibit 3, p. 132–B.

7. See petitioner's exhibit 3, p. 132–A.

indictment under which petitioner was convicted was returned. Obviously, counsel for petitioner had an opportunity to prepare their case before December 31, 1962.

On January 14, 1963, a preliminary qualification of a special venire and a hearing on various motions, including three defense motions for continuance, were held. On January 15, 1963, the defendant was arraigned, and the examination of veniremen continued until January 21, 1963 when the jury selection was completed, the jury empanelled and testimony commenced. The testimony continued through January 22 and 23, 1963, and the Court's charge was given on January 24. The jury retired at 4:45 p. m. on January 24, 1963 and returned at 6:04 p. m. of that day with its verdict of sane at the time of the offense and trial, and guilty of murder with malice, and assessing the penalty at death. On March 7, 1963, defendant's motion for new trial was denied and notice of appeal given. On March 11, 1963, an Order Directing Reporter to Prepare Statement of Facts was filed. It is very evident from the foregoing facts that petitioner's contention of being hurried to conviction under mob domination has no merit.

This is not such a situation as was presented in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 542 (1963). In that case, a few hours after defendant was arrested and charged with murder, a twenty-minute, taped interview was made of defendant in jail, in which he admitted a bank robbery, kidnapping and murder. This filmed interview was broadcast over a television station for three straight days in the city in which the crimes took place and where the trial was to be held, the first broadcast day being the day of the arrest. A motion for change of venue was denied, and defendant was later convicted and sentenced to death. Three of the jurors had seen the taped interview in which defendant confessed. These jurors were challenged for cause, but the challenges were denied.

The Supreme Court reversed, holding that it was a denial of due process of law to refuse the request for change of venue after the people of the parish

"had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. * * * [T]his spectacle * * * in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."

In the instant case there was no televised interview of petitioner confessing. There was merely the printing of the confession in the newspaper, which would not constitute a denial of due process unless it be proved that prejudice preventing a fair trial resulted therefrom. See Stroble v. Calif., supra, 343 U.S. at 193, 72 S.Ct. 599 (1952). Furthermore, no complaint is made that the trial court denied challenges for cause as to jurors who had read the confession. The most important distinction between Rideau and the instant case is that Rideau held that under the circumstances presented it was a denial of due process to *refuse a request for change of venue,* but here no request for a change of venue was ever made. Therefore, Rideau is inapplicable.

Petitioner asserts that the atmosphere of the trial was such that not only was he prevented from obtaining a fair trial, but the trial officials and jury were in fear for their lives if a verdict other than death were returned. Petitioner has the burden of proving this contention to a demonstrable certainty, which he has failed to do.

While not dispositive of the issue here, it is very significant that the two experienced and competent counsel who were vigorous in petitioner's defense throughout the trial saw no occasion to seek a transfer of the action to another county. See Stroble v. Calif., supra, 343 U.S. at 195, 72 S.Ct. 599, and Latham v. Crouse, 330 F.2d 865 (10th Cir. 1964). While it

is true that petitioner's counsel made several requests for a continuance, the only one filed [8] reflects that the basic reason for the requests was not to allow community prejudice to dissipate, but to obtain additional time to prepare the case.[9]

At the first hearing on March 18, 1964, petitioner's two defense counsel, Robert Doss and Charles E. Hughes, testified that because of the past history of racial violence, the large number of armed policemen, the large crowd and general sentiment, petitioner did not receive a fair trial. Furthermore, Dean Martin, the county attorney who was one of the prosecutors in petitioner's case, testified that he could not deny that the verdict of the jury *may* have been influenced by the atmosphere at the trial.

The evidentiary hearing was recessed, and upon readjournment on March 23, 1964, two of the jurors at petitioner's trial, the foreman Charles Wingrow and Mike Burton, testified they were in no way influenced by any hostility on the part of spectators and, furthermore, detected none. They also testified they were not intimidated nor influenced by the presence of peace officers. They stated that they based their verdict solely on the evidence offered at the trial. Mr. R. C. Slagle, Jr., who had been a special prosecutor in the case, testified that he, also, discerned no hostility among the courtroom spectators and that during most of the trial only three police officers were present, although when the verdict was returned there were a number of officers present to prevent any outbursts.

I reject the testimony of defense counsel given to support their contention that the jury was affected by alleged mob hysteria and community prejudice, although I commend their zeal and do not question their good faith. Neither am I persuaded by the testimony of the special prosecutor generally to the opposite effect, for the same reason. Bolstering opinion testimony of counsel in this type inquiry is not helpful to the Court. I am impressed by the testimony of the two jurors to the effect they detected no hostility on the part of spectators, but if any there were, these jurors were not affected by it. I find that petitioner has failed to discharge his burden to demonstrate the existence of mob hysteria or community prejudice denying him a fair trial. It must be clearly understood that the criteria here is not "speculation" but "demonstrable reality." Adams v. United States ex rel. McCann, supra. This contention of petitioner is wholly without factual support in the record.

Petitioner's application for a writ of habeas corpus is therefore denied, and this opinion constitutes final judgment in this matter.

The Clerk will file this Memorandum and Order, and send a copy of it to petitioner's counsel and to the respondent.

8. See petitioner's Exhibit 1, p. 4.

9. It does, however, also assert that the calling of such an unusually large number of veniremen that chairs could not be provided for all of them created an atmosphere of violence, particularly since there had been past incidents of racial violence in the area. Furthermore, petitioner's counsel added orally at the state court hearing on January 14, 1963 another ground for a continuance, which was that the presence of approximately 10 armed lawmen in an overly crowded courtroom created a hostile atmosphere. See petitioner's Exhibit 3, p. 84. However, the conspicuous absence of a request for a change of venue reflects that the motion for continuance was, as it essentially shows on its face, to obtain additional time for preparation, and not to allow community hostility to dissipate.